APPEAL

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:23−mc−00007−RC</u>
### *Internal Use Only*

IN RE JEFFREY B. CLARK

Assigned to: Judge Rudolph Contreras

Related Cases:  1:22−mc−00096−RC

                     1:22−mc−00117−RC

Case in other court:  DC Court of Appeals, 22−BD−039

Cause: MS:NoticeR

Date Filed: 01/26/2023

Jury Demand: None

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: U.S. Government Defendant

**In Re**

| | | |
|---|---|---|
| **JEFFREY B. CLARK** | represented by | **Charles Burnham** |
| | | BURNHAM & GOROKHOV PLLC |
| | | 1424 K St. NW |
| | | Suite 500 |
| | | Washington, DC 20005 |
| | | 202−386−6920 |
| | | Email: charles@burnhamgorokhov.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Petitioner**

| | | |
|---|---|---|
| **JEFFREY B. CLARK** | represented by | **Charles Burnham** |
| *(A Member of the Bar of the District of Columbia Court of Appeals (Bar Registration No. 455315)* | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

V.

**Respondent**

| | | |
|---|---|---|
| **D.C. OFFICE OF DISCIPLINARY COUNSEL** | represented by | **Hamilton P. Fox , III** |
| | | OFFICE OF DISCIPLINARY COUNSEL |
| | | 515 5th Street, N.W. |
| | | Building A |
| | | Suite 117 |
| | | Washington, DC 20001 |
| | | 202−638−1501 |
| | | Email: foxp@dcodc.org |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2023 | <u>1</u> | |

| | | |
|---|---|---|
| | | NOTICE OF REMOVAL from DC Court of Appeals, case number 22–BD–039 Filing fee $ 402, receipt number ADCDC–9814019 filed by JEFFREY B. CLARK. (Attachments: # 1 Exhibit Email, # 2 Exhibit Email, # 3 Exhibit Declaration, # 4 Exhibit Email, # 5 Exhibit Email, # 6 Exhibit Email, # 7 Exhibit Subpoena, # 8 Exhibit Email with Draft Motion, # 9 Exhibit Email, # 10 Exhibit Continuance Motion Filed, # 11 Exhibit Email, # 12 Exhibit Email, # 13 Exhibit Email, # 14 Exhibit DCCA Order)(Burnham, Charles) (Entered: 01/26/2023) |
| 01/26/2023 | 2 | CIVIL COVER SHEET by JEFFREY B. CLARK filed by JEFFREY B. CLARK.(Burnham, Charles) (Entered: 01/26/2023) |
| 01/26/2023 | 3 | NOTICE OF RELATED CASE by JEFFREY B. CLARK. Case related to Case No. 1:22mc117. (Burnham, Charles) (Entered: 01/26/2023) |
| 01/26/2023 | | NOTICE OF ERROR re 1 Notice of Removal; emailed to charles@burnhamgorokhov.com, cc'd –1 associated attorneys –– The PDF file you docketed contained errors: 1. Filing fee for miscellaneous case not paid. Please remit filing fee payment via check or money order. In the future, do not file these kinds of cases electronically., 2. **COMPLIANCE DEADLINE is by close of business today. This case will not proceed any further until all errors are satisfied.** (zljn, ) (Entered: 01/26/2023) |
| 02/03/2023 | | Filing fee received: $ 49, receipt number: 203936. (zljn) (Entered: 02/03/2023) |
| 02/03/2023 | | Case Assigned to Judge Rudolph Contreras. (zljn) (Entered: 02/03/2023) |
| 02/08/2023 | 4 | Third MOTION to Remand to State Court by D.C. OFFICE OF DISCIPLINARY COUNSEL. (Attachments: # 1 Memorandum in Support)(Fox, Hamilton) (Entered: 02/08/2023) |
| 02/22/2023 | 5 | RESPONSE re 4 Third MOTION to Remand to State Court filed by JEFFREY B. CLARK. (Burnham, Charles) (Entered: 02/22/2023) |
| 02/22/2023 | 6 | Cross MOTION to Consolidate Cases by JEFFREY B. CLARK. (See Docket Entry 5 to view document.) (ztth) (Entered: 02/24/2023) |
| 06/08/2023 | 7 | ORDER granting 4 the D.C. Office of Disciplinary Counsel's Motion to Remand. See document for details. Signed by Judge Rudolph Contreras on 6/8/23. (lcrc2) (Entered: 06/08/2023) |
| 06/08/2023 | 8 | MEMORANDUM OPINION granting 4 the D.C. Office of Disciplinary Counsel's Motion to Remand. See document for details. Signed by Judge Rudolph Contreras on 6/8/23. (lcrc2) (Entered: 06/08/2023) |
| 06/11/2023 | 9 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 7 Order on Motion to Remand to State Court by JEFFREY B. CLARK, JEFFREY B. CLARK. Filing fee $ 505, receipt number ADCDC–10130865. Fee Status: Fee Paid. Parties have been notified. (Burnham, Charles) (Entered: 06/11/2023) |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

IN RE: JEFFREY B. CLARK,

A member of the Bar of the
District of Columbia Court of
Appeals (Bar No. 455315)

Case Nos. 22-mc-00096, 22-mc-00117,
and 23-mc-00007 (consolidated)

**NOTICE OF APPEAL**

Plaintiff/Charge Respondent Jeffrey B. Clark hereby files this notice of appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order of the United States District Court for the District of Columbia, entered June 8, 2023, granting motions to remand filed by Defendant/Charging Party Disciplinary Counsel Hamilton P. ("Phil") Fox. Appeals of right lie from remand orders arising from federal officer removal cases pursuant to 28 U.S.C. § 1447(d).

Respectfully submitted this 11th day of June 2023.

/s/ *Charles Burnham*
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K St. NW
#300
Washington, DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

/s/ *Harry W. MacDougald*
Harry W. MacDougald
Georgia Bar No. 463076
Caldwell, Carlson, Elliott & DeLoach LLP
Two Ravinia Drive, Suite 1600
Atlanta, Georgia 30346
(404) 843-1956
hmacdougald@ccedlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served counsel for the opposing party with

a copy of this **Notice of Appeal** by filing with the Court's electronic filing system and by

email addressed to:

Hamilton P. Fox, Esq.
Jason P. Horrell, Esq.
Office of Disciplinary Counsel
Building A, Room 117
515 5th Street NW
Washington DC 20001
foxp@dcodc.org
horrellj@dcodc.org


This 11th day of June 2023.

/s/ *Charles Burnham*
Charles Burnham
DC Bar No. 1003464
Burnham and Gorokhov, PLLC
1750 K St. NW
#300
Washington, DC 20006
(202) 386-6920
charles@burnhamgorokhov.com

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                         |   |            |             |
|-------------------------|---|------------|-------------|
|                         | : |            |             |
| IN RE JEFFREY B. CLARK  | : | Case Nos.: | 22-mc-0096  |
|                         | : |            | 22-mc-0117  |
|                         | : |            | 23-mc-0007  |
|                         | : |            |             |

## <u>ORDER</u>

### GRANTING MOTIONS TO REMAND

For the reasons stated in the Court's Memorandum Opinion separately and contemporaneously issued, it is hereby **ORDERED** that the D.C. Office of Disciplinary Counsel's Motions to Remand (Case No. 22-mc-0096, ECF No. 5; Case No. 22-mc-0117, ECF No. 4; Case No. 23-mc-0007, ECF No. 4) are **GRANTED** and this matter shall be **REMANDED** for further proceedings.

It is **FURTHER ORDERED** that, because the Court lacks subject-matter jurisdiction over this matter, Mr. Clark's Motion to Stay Subpoena Response Deadline (Case No. 22-mc-0096, ECF No. 2) and Motion to Quash (Case No. 22-mc-0096, ECF No. 4) are **DENIED** as moot.

**SO ORDERED**.

Dated:  June 8, 2023                                    RUDOLPH CONTRERAS
                                                       United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |  |
|---|---|---|---|
| | : | | |
| IN RE JEFFREY B. CLARK | : | Case Nos.: | 22-mc-0096 |
| | : | | 22-mc-0117 |
| | : | | 23-mc-0007 |
| | : | | |

**MEMORANDUM OPINION**

**GRANTING MOTIONS TO REMAND**

## I.  INTRODUCTION

On July 19, 2022, the Office of Disciplinary Counsel ("ODC") for the D.C. Board on

Professional Responsibility (the "Board"), the entity that regulates the conduct of attorneys

admitted to the D.C. Bar, commenced a disciplinary proceeding against Jeffrey B. Clark, an

attorney admitted to the D.C. Bar and a former Assistant Attorney General of the United States.

*See* 1d Notice of Removal, Ex. A-2 ("Petition and Specification"), ECF No. 1-2.  Mr. Clark

removed the disciplinary proceeding to this Court, *see* 1d Notice of Removal, Case No. 22-mc-

0096, ECF No. 1, and subsequently filed separate notices of removal as to ODC's motion to

enforce a subpoena, *see* 2d Notice of Removal, Case No. 22-mc-0117, ECF No. 1, and as to a

separate subpoena later issued by ODC, *see* 3d Notice of Removal, Case No. 23-mc-0007, ECF

No. 1.  Before the Court are ODC's motions to remand.  *See* 1d Mot. Remand, ECF No. 5; 2d

Mot. Remand, ECF No. 4; 3d Mot. Remand, ECF No. 4.[1]  As set forth in detail below, because

---

[1] Because Mr. Clark filed three separate notices of removal, there are three separate case numbers and dockets corresponding to this matter.  For purposes of citations in this Opinion, all citations to Mr. Clark's first notice of removal, ODC's first motion to remand, and related submissions refer to docket entries in Case No. 22-mc-0096; all citations to Mr. Clark's second notice of removal, ODC's second motion to remand, and related submissions refer to docket entries in Case No. 22-mc-0117; and all citations to Mr. Clark's third notice of removal, ODC's third motion to remand, and related submissions refer to docket entries in Case No. 23-mc-0007. The parties have agreed to consolidate Case No. 22-mc-0096 and Case No. 22-mc-117.  *See*

the Court lacks subject-matter jurisdiction over the Board's disciplinary proceeding, ODC's

motions to remand are granted.[2]

## II.  BACKGROUND

### A.  The DCCA and Attorney Discipline in D.C.

In 1970, Congress passed legislation creating the Superior Court of the District of

Columbia and the District of Columbia Court of Appeals ("DCCA") as Article I courts.  *See*

District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358,

§ 101, 84 Stat. 473, 475 (1970).  For present purposes, two sections of that legislation bear

notice.  First, the legislation rewrote subchapter I of chapter 5 of title 11 of the D.C. Code, which

concerns the jurisdiction of the U.S. District Court for the District of Columbia.  *Id.*, 84 Stat. at

476.  As amended, that subchapter contained three sections.  The first two provided for the

District Court's jurisdiction, "[i]n addition to its jurisdiction as a United States district court and

any other jurisdiction conferred on it by law," over certain "civil action[s]" and "criminal

case[s]," respectively, brought under D.C. law.  *Id.*, 84 Stat. at 476–78.  The third provided that

"[a] civil action or criminal prosecution in the Superior Court of the District of Columbia is

---

ODC's Reply Supp. 2d Mot. Remand at 1, ECF No. 6.  The Court consolidates all three cases, as all involve "common question[s] of law or fact."  Fed. R. Civ. P. 42(a); *see Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11, 13 (D.D.C. 2001) ("The district court has broad discretion in determining whether to consolidate related cases.").

[2] Mr. Clark's third notice of removal nominally concerns a subpoena, but he claims that it was never served on him.  *See* 3d Notice of Removal at 1.  In addition, as explained below, the District of Columbia Court of Appeals has issued an order holding in abeyance a prior subpoena pending this Court's resolution of the first two motions to remand, *see* 3d Notice of Removal, Ex. 14, ECF No. 1-14, and ODC acknowledges both that the production deadline for the later subpoena has passed and that it has not brought a motion to compel a response to that subpoena, *see* 3d Mot. Remand at 1.  While the analysis herein would apply equally to the issues presented by removal of that subpoena, because it does not appear to represent a live proceeding over which the Court could exercise removal jurisdiction, the Court confines its analysis to the similar arguments raised in the parties' briefing on the first and second notices of removal and corresponding motions to remand.

removable to the United States District Court for the District of Columbia in accordance with [28 U.S.C. § 1441, *et seq.*]." *Id.*, 84 Stat. at 478. These provisions remain unchanged in the version of the D.C. Code in force today. *See* D.C. Code §§ 11-501–03.

Second, the legislation separately rewrote chapter 25 of title 11 of the D.C. Code. 84 Stat. at 520. It provided that the DCCA "shall make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension and expulsion," specifying that the DCCA "may censure, suspend from practice, or expel a member of its bar for crime, misdemeanor, fraud, deceit, malpractice, professional misconduct, or conduct prejudicial to the administration of justice." *Id.*, 84 Stat. at 521. The legislation required that "written charges, under oath" be filed with the DCCA before a member of "its bar" could be censured, suspended, or expelled, but also permitted "other courts"—the "Federal courts in the District of Columbia and the Superior Court"—to "censure, suspend, or expel an attorney from the practice at their respective bars." *Id.* All of this language remains unchanged in the D.C. Code today. *See* D.C. Code §§ 11-2501–04. No provision for removal of disciplinary actions to the U.S. District Court was included in the original legislation, nor has one been added since. *See* D.C. Code tit. 11, ch. 25.

Pursuant to its authority under this chapter, the DCCA has adopted standards of conduct for members of the D.C. Bar and rules governing attorney discipline. *See generally* D.C. Rules of Pro. Conduct (D.C. Bar 2018); D.C. Bar R. XI (disciplinary proceedings). Specifically, D.C. Bar Rule XI lays out the grounds for discipline and the procedure for disciplinary proceedings. *See* D.C. Bar R. XI. As relevant here, it establishes the Board and authorizes it to "consider and investigate any alleged ground for discipline . . . called to its attention, or upon its own motion, and to take such action with respect thereto as shall be appropriate to effect the purposes of this

rule." *Id.* § 4(e)(1).  In particular, Rule XI authorizes the Board to "adopt rules, procedures, and policies not inconsistent with this rule or any other rules of [the DCCA]," *id.* § 4(e)(10), which the Board has done, *see* Board Rules (Bd. on Prof. Resp. 2023).  Rule XI also empowers the Board to appoint "Disciplinary Counsel," together with a staff, and to appoint "Hearing Committees."  D.C. Bar R. XI*,* § 4(e)(2), (e)(4).

Disciplinary Counsel is charged with "investigat[ing] all matters involving alleged misconduct by an attorney subject to the disciplinary jurisdiction of [the DCCA]" and "prosecut[ing] all disciplinary proceedings before Hearing Committees, the Board, and the Court."  *Id.* § 6(a)(2), (a)(4).  Hearing Committees are three-member panels that "conduct hearings on formal charges of misconduct" and "submit their findings and recommendations on formal charges of misconduct to the Board, together with the record of the hearing."  *Id.* § 5(c).  The Board "review[s] the findings and recommendations of the Hearing Committees" and "prepare[s] and forward[s] its own findings and recommendations, together with the record of proceedings before the Hearing Committee and the Board, to the [DCCA]."  *Id.* § 4(e)(7).  Upon receiving the Board's report, the DCCA must "enter an appropriate order as soon as the business of the Court permits."  *Id.* § 9(h)(1).  In doing so, the DCCA must "accept the findings of fact made by the Board unless they are unsupported by substantial evidence of record, and shall adopt the recommended disposition of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted."  *Id.*

### B.  28 U.S.C § 530B, the McDade Amendment

In 1979, Congress folded a requirement into a Department of Justice ("DOJ") appropriations bill that DOJ attorneys "shall be duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the District of Columbia."  Department of Justice

Appropriation Authorization Act, Pub. L. No. 96-132, § 3(a), 93 Stat. 1040, 1044 (1979).  The

following year, the DOJ Office of Legal Counsel ("OLC"), responding to an American Bar

Association ("ABA") disciplinary rule that prohibited direct contact with a represented opposing

party without the consent of the party's counsel (the "no-contact rule"), issued an opinion finding

that "courts have no authority to exclude evidence solely on the basis of a violation of [the ABA

rule], and state bar associations may not, consistent with the Supremacy Clause, impose

sanctions on a government attorney who has acted within the scope of his federal

responsibilities."  *Ethical Restraints on the ABA Code of Professional Responsibility on Federal

Investigations*, 4B Op. O.L.C. 576, 577 (1980).

Spurred by unanimous state-level adoption of a version of the no-contact rule over the

following years, *see* Charles Doyle, Cong. Rsch. Serv., RL30060, McDade-Murtha Amendment:

Ethical Standards for Justice Department Attorneys 10 (2001), together with a Second Circuit

decision rejecting DOJ's argument that state bar ethics rules did not apply to prosecutors

conducting investigations before formal initiation of a prosecution, *see United States v.

Hammad*, 858 F.2d 834 (2d Cir. 1988), *cert. denied*, 498 U.S. 871 (1990), Attorney General

Richard Thornburgh issued a memorandum in 1989 to all DOJ litigators, *see N.Y. Bar Ass'n v.

FTC*, 276 F. Supp. 2d 110, 131–32 (D.D.C. 2003) (citing *Hammad*, 858 F.2d at 837).  The

Thornburgh Memorandum "encouraged" DOJ attorneys to be "sensitive to the interests that are

sought to be protected by [the no-contact rule]," but explained the "Department's position that

contact with a represented individual in the course of authorized law enforcement activity does

not violate [the no-contact rule]" and that DOJ would "resist, on Supremacy Clause grounds,

local attempts to curb legitimate federal law enforcement techniques."  *In re Doe*, 801 F. Supp.

478, 492–93 (D.N.M. 1992) (quoting in full the Thornburgh Memorandum).  Both the courts and

Congress took issue with the Thornburgh Memorandum.  *See, e.g.*, *United States v. Lopez*, 4 F.3d 1455, 1458 (9th Cir. 1993) (endorsing the district court's "trenchant analysis of the inefficacy of the [Thornburgh Memorandum]," which the district court described as "preposterous" (citing *United States v. Lopez*, 765 F. Supp. 1433, 1453 (N.D. Cal. 1991), *vacated on other grounds*, 989 F.2d 1032 (9th Cir.)); *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 961 F. Supp. 1288, 1294 (E.D. Mo. 1997) (quoting House Subcommittee's conclusion, after a hearing in 1990 "address[ing] the propriety of the Thornburgh Memorandum," that it "disagree[d] with the Attorney General's attempts to exempt departmental attorneys from compliance with the ethical requirements adopted by the State bars to which they belong and in the rules of the Federal Courts before which they appear.").

Still, in 1994, DOJ, under Attorney General Janet Reno, promulgated regulations "intended to preempt and supersede the application of state laws and rules and local federal court rules to the extent that they relate to contacts by attorneys for the government . . . with represented parties[.]"  *O'Keefe*, 961 F. Supp. at 1293 (quoting the version of 28 C.F.R. pt. 77 then in force).  But in 1998, the Eighth Circuit struck down these regulations as in excess of statutory authority.  *See U.S. ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir. 1998).

While this played out, Congress carried through the requirement from the 1979 appropriations bill that DOJ attorneys maintain state bar licensure.  *See, e.g.*, Department of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act [hereinafter "Appropriations Act"] of 1993, Pub. L. No. 102-395, § 102(a), 106 Stat. 1828, 1838 (1992) (reenacting the provisions in Pub. L. No. 96-132); Appropriations Act of 1994, Pub. L. No. 103-121, § 102, 107 Stat. 1153, 1163 (1993) (same); Appropriations Act of 1995, Pub. L.

No. 103-317, § 102, 108 Stat. 1724, 1734 (1994) (same); Appropriations Act of 1998, Pub. L.

No. 105-119, § 102, 111 Stat. 2440, 2456–57 (1997) (same); Appropriations Act of 2000, Pub.

L. No. 106-113, § 102, 113 Stat. 1501, 1501A-19 (1999) (same). And in 1998, less than a year

after the Eight Circuit's decision in *O'Keefe*, Congress passed what is referred to as the McDade

Amendment, after its sponsor Representative Joseph McDade.  *See* Omnibus Consolidated and

Emergency Supplemental Appropriations Act of 1999, Pub. L. No. 105-277, § 801, 112 Stat.

2681, 2681-118–19 (1998).  Passed as a rider to an omnibus appropriations bill, the McDade

Amendment, as codified at 28 U.S.C. § 530B (hereinafter "section 530B"), provides in full:

> (a) An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.

> (b) The Attorney General shall make and amend rules of the Department of Justice to assure compliance with this section.

> (c) As used in this section, the term "attorney for the Government" includes any attorney described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations and also includes any independent counsel, or employee of such a counsel, appointed under chapter 40.

The McDade Amendment passed after Representative McDade introduced a standalone

version of the legislation in May 1996, *see* H.R. 3386, 104th Cong. (1996), reintroduced it in

January 1997, *see* H.R. 232, 105th Cong. (1997), and reintroduced it again together with

Representative John Murtha in amended form in March 1998, *see* H.R. 3396, 105th Cong.

(1998).  The version passed into law closely resembled the 1996 and 1997 bills, and the

committee report explained that the enacted version "includes language to make government

attorneys subject to laws and rules of the State and the rules of the local Federal court in which

they are practicing" and "addresses the concerns of the Committee about the Department of

Justice's issuance of a regulation that exempts its attorneys from the same State laws and rules of

7

ethics which all other attorneys must follow." H.R. Rep. No. 105-636, at 154 (1998). In April

1999, pursuant to section 530B(b), DOJ promulgated regulations to enforce the McDade

Amendment. *See* Ethical Standards for Attorneys for the Government, 64 Fed. Reg. 19273,

19275 (Apr. 20, 1999) (codified in 28 C.F.R. pt. 77).

### C.  Disciplinary Charges Against Mr. Clark

On July 19, 2022, ODC filed with the Board a Petition Instituting Formal Disciplinary

Proceedings against Mr. Clark together with a Specification of Charges (the "Specification").

*See* Petition and Specification. The Specification alleges that Mr. Clark, who "at all relevant

times" concurrently served in DOJ as Assistant Attorney General for the Environment and

Natural Resources Division and Acting Assistant Attorney General for the Civil Division,

"attempted to engage in conduct involving dishonesty" in violation of D.C. Bar Rules 8.4(a) and

(c) and "attempted to engage in conduct that would seriously interfere with the administration of

justice" in violation of D.C. Bar Rules 8.4(a) and (d). *Id.* ¶¶ 8, 31. These charges arose out of

Mr. Clark's alleged conduct in the wake of the 2020 presidential election. The Specification

alleges that, despite having "no involvement in or responsibility for [DOJ's] post-election

investigations into allegations of fraud or irregularities," on December 28, 2020, Mr. Clark

tasked a senior counsel in the Civil Division with researching "the authority of state legislatures

to send unauthorized slate [*sic*] of electors to Congress." *Id.* ¶¶ 9, 12. Mr. Clark allegedly then

"used this research to write" what came to be referred to as the "Proof of Concept letter," which

he emailed to the Deputy Attorney General, Jeffrey Rosen, and the Principal Associate Deputy

Attorney General, Richard Donoghue. *Id.* ¶¶ 4, 12, 13 (formatting omitted). The Proof of

Concept letter, which was "drafted to be signed by Mr. Rosen, Mr. Donoghue and [Mr. Clark],"

and "addressed to the Georgia Governor, Speaker of the House, and President *Pro Tempore* of

the Senate," "recommended that the Governor call the Georgia legislature into special session and argued that if the Governor refused to do so, the legislature had the authority to convene such a session on its own initiative." *Id.* ¶ 14.

The Specification alleges that the Proof of Concept letter contained multiple false or misleading statements. First, the letter "stated that the Department of Justice had 'identified significant concerns that may have impacted the outcome of the election in multiple States, including the State of Georgia.'" *Id.* ¶ 15. The Specification alleges that this statement was false, as DOJ was "aware of no allegations of fraud in Georgia that would have affected the results of the presidential election." *Id.* Second, the letter "stated that [DOJ] found 'troubling the current posture of a pending lawsuit in Fulton County' and the 'litigation's sluggish pace.'" *Id.* ¶ 16. The Specification alleges that this statement also was false, as DOJ "had no involvement in the Fulton County case and was not concerned by its lack of progress." *Id.* Third, the letter stated that DOJ "believed 'that in Georgia . . . both a slate of electors supporting Joseph R. Biden, Jr., and a separate slate of electors supporting Donald J. Trump, gathered on that day at the proper location to cast their ballots, and that both sets of those ballots have been transmitted to Washington, D.C., to be opened by Vice President Pence.'" *Id.* ¶ 17. The Specifications alleges that this statement was "misleading," as the "Governor of Georgia had certified a slate of electors to the Electoral College pledged to Joseph Biden, and there was no legitimate alternative slate of Georgia electors pledged to Donald Trump." *Id.* Fourth, the letter stated that DOJ "had concluded that the Governor should convene a special session of the Georgia legislature. *Id.* ¶ 18. The Specification alleges that this "statement was false," as DOJ "had not made such a determination." *Id.* Finally, the letter "stated that [DOJ] had concluded that if the Governor refused to convene a special session of the Georgia legislature, the

legislature had the authority to do so on its own initiative." *Id.* ¶ 19.  The Specification alleges that this "statement was false," as DOJ "had made no such determination." *Id.*

The Specification also details efforts allegedly undertaken by Mr. Clark to ensure the Proof of Concept letter's transmission, over the objections of his superiors, Mr. Rosen and Mr. Donoghue.  Specifically, it alleges that "a little more than an hour" after Mr. Clark sent the Proof of Concept letter to Mr. Rosen and Mr. Donoghue, Mr. Donoghue responded, in a message copying Mr. Rosen, that he would not sign the letter because he "kn[e]w of nothing that would support the statement 'we have identified significant concerns that may have impacted the outcome of the election in multiple states'" and did not think DOJ's "role should include making recommendations to a State legislature about how they should meet their Constitutional obligations to appoint Electors." *Id.* ¶ 20.  That evening, Mr. Clark allegedly met with Mr. Rosen and Mr. Donoghue, who informed Mr. Clark that they "would not authorize or sign the letter because it contained false statements." *Id.* ¶ 21.  On January 2, 2021, Mr. Clark allegedly had a second meeting with Mr. Rosen and Mr. Donoghue, at which he "informed them that the President had offered him the position of Acting Attorney General, and that he was thinking about accepting it if Mr. Rosen and Mr. Donoghue were unwilling to send the Proof of Concept letter." *Id.* ¶ 23.  After Mr. Rosen and Mr. Donoghue again refused to send the letter, Mr. Clark allegedly met with Mr. Rosen again the following day and told him that "he intended to accept the President's offer to become Acting Attorney General and that he would send the Proof of Concept letter once he assumed the position." *Id.* ¶ 26.

The Specification states that Mr. Rosen informed Mr. Donoghue, who in turn informed "some of the Assistant Attorneys General," all of whom "agreed that they would resign if [Mr. Clark] carried out his plan." *Id.* ¶ 27.  The following day, Mr. Rosen organized a meeting

10

between himself, the President, Mr. Clark, Mr. Donoghue, the White House Counsel, and two additional lawyers.  *See id.* ¶ 28.  In the meeting, "all the lawyers argued against appointing [Mr. Clark] as Acting Attorney General," and "[a]ll but [Mr. Clark] opposed sending the letter," but Mr. Clark allegedly "stated that he would send the Proof of Concept letter if the President appointed him Acting Attorney General."  *Id.* ¶ 29.  Mr. Donoghue allegedly informed the President that "he should expect that all the Assistant Attorneys General would resign" if Mr. Clark was appointed Acting Attorney General, and that he believed "a number" of U.S. Attorneys would too.  *Id.* ¶ 30.  The White House Counsel also allegedly threatened to resign. *See id.*  The Specification states that "[t]he President decided not to appoint [Mr. Clark] Acting Attorney General, and the Proof of Concept letter was never sent."  *Id.*

### D.  Relevant Procedural History

Mr. Clark's notices of removal and the more than 100 attached exhibits reveal a labyrinthine procedural history beginning before ODC filed the Petition and Specification.  The Court briefly summarizes the most relevant pieces of this backstory.  The disciplinary proceeding against Mr. Clark was assigned to Hearing Committee Number Twelve.  *See* 1d Notice of Removal at 6.  On October 6, 2022, ODC served on Mr. Clark a subpoena for documents.  *Id.* Ex. A-54, ECF No. 1-54.  On October 17, 2022, Mr. Clark filed a notice of removal in this Court, purporting to remove the disciplinary proceeding on the basis of federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441 and federal officer jurisdiction pursuant to 28 U.S.C. § 1442(a)(1).  *See* 1d Notice of Removal, ECF No. 1.  Mr. Clark subsequently filed a motion to stay the deadline for responding to the October 6 subpoena and a motion to quash.  *See* Mot. Stay, ECF No. 2; Mot. Quash, ECF No. 4.  On October 21, 2022, ODC moved to remand. *See* 1d Mot. Remand, ECF No. 1-5.  On October 26, 2022, ODC moved in the DCCA to enforce

11

its October 6 subpoena.  *See* 2d Notice of Removal, Ex. A-3, ECF No. 1-3.  Mr. Clark filed a

second notice of removal as to that motion on November 25, 2022, *see id.*, and ODC filed a

second motion to remand on November 29, 2022, *see* 2d Mot. Remand, ECF No. 4.  On

December 27, 2022, ODC attempted to serve another subpoena on Mr. Clark.  *See* 3d Notice of

Removal, Ex. 7, ECF No. 1-7; 3d Notice of Removal at 4–5, ECF No. 1.  On January 17, 2023,

the DCCA issued an order holding in abeyance ODC's motion to enforce the October 6

subpoena "until [Mr. Clark's] removal of this matter to the United States District Court for the

District of Columbia has been resolved."  3d Notice of Removal, Ex. 14, ECF No. 1-14.  Still,

Mr. Clark filed a third notice of removal as to the December 27 subpoena on January 26, 2023,

*see* 3d Notice of Removal, and ODC filed a third motion to remand on February 8, 2023, *see* 3d

Mot. Remand, ECF No. 4.

### III.  LEGAL STANDARD

Removal and remand are governed by 28 U.S.C. § 1441 *et seq*.  Section 1441 provides

for removal, "[e]xcept as otherwise expressly provided by Act of Congress," of "any civil action

brought in a State court of which the district courts of the United States have original

jurisdiction."  § 1441(a).  Additionally, section 1442, the federal officer removal statute, provides

in relevant part that "[a] civil action or criminal prosecution that is commenced in a State court"

may be removed to U.S. district court if it is "against or directed to"

> [t]he United States or any agency thereof or any officer (or person acting under that
> officer) of the United States or of any agency thereof, in any official or individual
> capacity, for or relating to any act under color of such office or on account of any right,
> title or authority claimed under any Act of Congress for the apprehension or punishment
> of criminals or the collection of the revenue.

§ 1442(a).  Section 1442 also contains a paragraph defining "State" to include the District of

Columbia and "State court" to include "the Superior Court of the District of Columbia, a court of

a United States territory or insular possession, and a tribal court." § 1442(d)(1), (d)(5)–(6).

Sections 1446 and 1455 go on to provide the procedures for removal of civil actions and criminal

prosecutions, respectively. *See* §§ 1446, 1455. Section 1447 governs remand after removal,

providing that, "[i]f at any time before final judgment it appears that the district court lacks

subject matter jurisdiction, the case shall be remanded." § 1447(c).

"When a plaintiff seeks to have a case that has been removed to federal court remanded

back to state court, the party opposing a motion to remand bears the burden of establishing that

subject matter jurisdiction exists in federal court." *Mizell v. SunTrust Bank*, 26 F. Supp. 3d 80,

84 (D.D.C. 2014) (quotation omitted). Courts in this Circuit generally "construe[] removal

jurisdiction strictly, favoring remand where the propriety of removal is unclear," *Ballard v.*

*District of Columbia*, 813 F. Supp. 2d 34, 38 (D.D.C. 2011), except that cases removed under

§ 1442 should be construed "liberally in favor of removal," *K&D LLC v. Trump Old Post Off.*

*LLC*, 951 F.3d 503, 506 (D.C. Cir. 2020).

## IV.  ANALYSIS

Mr. Clark's notices of removal and the parties' submissions in relation to ODC's

corresponding motions to remand are addressed to the same controlling jurisdictional questions,

so the Court considers them together, except as explained *supra* note 2. Mr. Clark asserts two

sources of federal jurisdiction: federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1441

and federal officer removal jurisdiction pursuant to 28 U.S.C. § 1442. *See* 1d Notice Removal at

23–34; Opp'n to 2d Mot. Remand at 3–7; 19–23, ECF No. 13.

### A.  "Civil Action" or "Criminal Prosecution"

Mr. Clark acknowledges that this case is neither a "civil action" nor "criminal

prosecution" within the meaning of 28 U.S.C. §§ 1441, 1442, 1446, 1455. Instead, he argues

that the "hybrid nature of Bar disciplinary proceedings as quasi-criminal" requires the Court to "harmonize the removal statutes' treatment of civil and criminal cases."  Opp'n to 2d Mot. Remand at 17–18 (arguing that "D.C. bar discipline proceedings are **both** criminal **and** civil"). ODC takes the position that disciplinary proceedings are "neither civil nor criminal" and therefore not removeable.  1d Mot. Remand at 6.  Confining its analysis to the nature of the Board's proceeding against Mr. Clark, the Court agrees with ODC.

    1.  The Board's Disciplinary Proceeding is not a Civil Action under §§ 1441, 1442, 1446

    Mr. Clark concedes that this case is not purely a "civil action" under sections 1441, 1442 and 1446.  *See* 1d Notice of Removal at 1 ("Jeffrey B. Clark ('Respondent') hereby gives notice and removes this quasi-prosecution case . . .").  This is appropriate, as the disciplinary proceeding bears none of the essential hallmarks of a civil case.  It involves no "private injury," *Wisconsin v. Pelican Ins. Co.*, 127 U.S. 265, 299 (1888), *overruled on other grounds by Milwaukee v. M.E. White Co.*, 296 U.S. 268 (1935); *see also* Action, Black's Law Dictionary (11th ed. 2019) (defining "civil action" as "[a]n action brought to enforce, redress, or protect a private or civil right").  Nor is it "of a character traditionally cognizable by courts of common law or of equity."  *Milwaukee v. M.E. White*, 296 U.S. at 271; *see also Leis v. Flynt*, 439 U.S. 438, 442 (1979) (rejecting out-of-state lawyers' claim of right to appear *pro hac vice* in Ohio court, explaining that "[s]ince the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia," which "prescribe the qualifications for admission to practice and the standards of professional conduct" and "are responsible for the discipline of lawyers").  Other federal courts have similarly found that attorney disciplinary proceedings are not "civil actions" under the removal statute.  *See, e.g.*, *Mass. Bd. of Bar Overseers v. Belanger*, No. 20-cv-10445, 2020 WL 1821826, at *2 (D. Mass.

Apr. 10, 2020) (finding that a bar disciplinary action is "not a civil matter but, rather, 'quasi-criminal' or '*sui generis*, neither civil nor criminal in character' such that this court has no jurisdiction" (citations omitted)); *Colorado v. Ziankovich*, No. 19-cv-3087, 2019 WL 6907460, at *2 (D. Colo. Dec. 19, 2019) (finding that attorney disciplinary proceedings are "not 'civil actions' subject to removal"); *Sup. Ct. of Cal. v. Kinney*, No. 15-cv-1552, 2015 WL 3413232, at *5 (N.D. Cal. May 27, 2015) ("[T]he disciplinary proceedings formerly pending before the State and now pending before the California Supreme Court are not 'civil actions'; they 'are *sui generis*, neither civil nor criminal in character.'") (citations omitted); *Ala. Bar Ass'n v. Dickerson*, 240 F. Supp. 732, 734 (D. Ala. 1965) (finding an attorney disciplinary proceeding "not a civil action within the contemplation of the federal removal statute").

  This understanding also comports with the history of the removal statute.  The version of the removal statute in effect until 1948 provided for removal of "[a]ny suit of a civil nature, at law or in equity," over which U.S. district courts have original jurisdiction.  Judicial Code of 1911, § 28, 36 Stat. 1087, 1094 (1911).  In 1948, Congress codified Title 28, and in doing so revised the general removal statute to the formulation that endures in relevant part today permitting removal of "any civil action brought in a State court" over which U.S. district courts have original jurisdiction, "[e]xcept as otherwise expressly provided by Act of Congress."  Pub. L. No. 773, 62 Stat. 937 (1948); *see* 28 U.S.C. § 1441.  "The right to remove a case from a state to a federal court is purely statutory," Charles A. Wright & Arthur R. Miller, 14C *Federal Practice and Procedure* § 3721 (4th ed. 2023), and "[b]ecause of the significant federalism concerns involved, [the court] strictly construes the scope of its removal jurisdiction," *Downey v. Ambassador Dev.*, 568 F. Supp. 2d 28, 30 (D.D.C. 2008) (citing *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 107–09 (1941)).  Consistent with this approach, the Court views as

significant Congress's decision to limit the scope of removeable proceedings from "[a]ny suit of a civil nature, at law or in equity" to only "any civil action brought in a State court" and not otherwise expressly barred by Congress.  Mr. Clark argues that the "hybrid nature" of the disciplinary proceeding makes it "both criminal and civil" for purposes of evaluating removal under section 1442.  *See* Opp'n to 2d Mot. Remand at 18.  But to whatever extent certain features of the Board's disciplinary proceeding could be viewed as "civil in nature," *see, e.g.*, Board Rules, ch. 3 (governing discovery), as explained above, they do not transform the proceeding into a "civil action" within the meaning of sections 1441, 1442, and 1446.

2.  The Board's Disciplinary Proceeding Is Not a Criminal Prosecution under §§ 1442, 1455

Unlike with civil actions, there is no statute generally permitting removal of criminal prosecutions.  This reflects the understanding, grounded in principles of federalism and comity, that upon removal of a state prosecution to a federal court, "the jurisdiction of the courts of a state to try offenses against its own laws and in violation of its own peace and dignity is wrested from it by the order of an inferior federal court."  *Maryland v. Soper*, 270 U.S. 9, 29 (1926); *see also California v. Mesa*, 813 F.2d 960, 966 (9th Cir. 1987) (explaining that "removal of state criminal prosecutions constitutes a far greater disruption of legitimate state authority than removal of state law civil suits against federal officials" because "removal forces the state to enforce its own laws in an alien forum" and "a polity's ability to protect its citizens from violence and other breaches of the peace through enforcement of criminal laws is the centermost pillar of sovereignty").  Instead, Mr. Clark relies on section 1442(a)(1)'s provision for removal of criminal prosecutions against federal officers.

Recall that section 1442(a) permits removal of a "civil action or criminal prosecution that is commenced in a State court and that is against or directed to . . . any officer . . . of the United

16

States . . . in an official or individual capacity, for or relating to any act under color of [his] office."  § 1442(a).  While section 1442 operates as an exception to the general rule that the cause of action must arise under federal law in order to establish federal jurisdiction, an officer seeking removal under section 1442 still must "raise a colorable federal defense."  *K&D LLC*, 951 F.3d at 506 (quoting *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999)).

Mr. Clark relies heavily on *In re Artis*, 883 A.2d 85 (D.C. 2005) to analogize the Board's disciplinary proceeding to a criminal prosecution.  *See, e.g.*, 1d Notice of Removal ¶¶ 48–49; Opp'n to 1d Mot. Remand at 16–17; Opp'n to 2d Mot. Remand at 17.  In that case, the DCCA, acknowledging the "quasi-criminal" nature of a disciplinary proceeding commenced by the Board, found no error in the Board's decision to recognize the respondent's right to assert the Fifth Amendment privilege against self-incrimination to avoid answering interrogatories.  *See In re Artis*, 883 A.2d at 101, 103.  Without disagreeing with the argument that the proceeding would not result in "criminal liability," the court emphasized that "the privilege against self-incrimination can be asserted in any proceeding, including administrative, investigatory or adjudicatory ones."  *Id.* at 102–03.  The court explained that "[t]he Fifth Amendment protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."  *Id.* (quoting *Littlejohn v. United States*, 705 A.2d 1077, 1083 (D.C. 1997) (internal quotation omitted)).  As the court suggested, the mere fact that one may invoke the Fifth Amendment in the context of a disciplinary proceeding does not transform the proceeding into a criminal prosecution for purposes of removal.  *See City of Neodesha v. BP Corp. N. Am.*, 176 F. Supp. 3d 1233, 1243 (D. Kan. 2016) (explaining, before finding state complaints for violations of a city waste ordinance civil actions for purposes of removal, that the fact that a "proceeding provides procedural

17

protections that are usually reserved for criminal trials does not turn [them] into criminal prosecutions" (citing *Allen v. Illinois*, 478 U.S. 364, 371 (1986)).

Moreover, the Board's disciplinary proceeding serves a different primary purpose than a criminal prosecution.  Whereas "[p]unitive fines and imprisonment are the common tools of the criminal law," "[t]ools of attorney discipline, such as reprimands, are not traditional criminal punishments."  *Wolters Kluwer Fin. Servs. v. Scivantage*, 564 F.3d 110, 117 (2d Cir. 2009); *see Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982) ("States traditionally have exercised extensive control over the professional conduct of attorneys.  The ultimate objective of such control is the protection of the public, the purification of the bar and prevention of recurrence." (cleaned up)).  This distinction has deep roots.  *See Ex parte Wall*, 107 U.S. 265, 288 (1883) ("[T]he constitutional privilege of trial by jury for crimes does not apply to prevent the courts from punishing its officers for contempt, or from removing them in proper cases.").  At the same time, whatever the primary aim of a bar disciplinary proceeding, the Supreme Court also has acknowledged that "[d]isbarment, designed to protect the public, is a punishment or penalty imposed on the lawyer."  *In re Ruffalo*, 390 U.S. 544, 550 (1968); *see also Charlton v. FTC*, 543 F.2d 903, 906 (D.C. Cir. 1976) (quoting the same language from *In re Ruffalo* in the context of reviewing a decision by the Federal Trade Commission to reprimand an attorney and suspend him from practicing before it).

Perhaps in light of this tension, the Supreme Court also has held, in the context of evaluating the nature of contempt proceedings, that courts generally should "defer[] to a legislature's determination whether a sanction is civil or criminal," as "state law provides strong guidance about whether or not the State is exercising its authority in a nonpunitive, noncriminal manner."  *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 838 (1994)

(quoting *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 631 (1988) (internal quotation omitted)). The DCCA, the highest court in D.C., has repeatedly held, in decisions both before and after *In re Artis*, that, "[i]n all cases, the purpose of imposing a sanction is not to punish the attorney, but to protect the public and the courts, safeguard the integrity of the profession, and deter respondent and other attorneys from engaging in similar misconduct." *In re Cater*, 887 A.2d 1, 17 (D.C. 2005); *see also In re Kanu*, 5 A.3d 1, 16 (D.C. 2010) (explaining the purpose of attorney discipline to "protect the public, the courts, and the legal profession."); *In re Abrams*, 689 A.2d 6, 12 (D.C. 1997) ("Disciplinary sanctions are designed to maintain the integrity of the profession, to protect the public and the courts, and to deter other attorneys from engaging in similar misconduct.  Our purpose in conducting disciplinary proceedings and imposing sanctions is not to punish the attorney; rather, it is to offer the desired protection by assuring the continued or restored fitness of an attorney to practice law." (cleaned up)).  The D.C. Code also makes clear that disciplinary actions by the Board are not considered criminal prosecutions in the District of Columbia.  *See* D.C. Code § 23-101 (providing, in section titled "Conduct of prosecutions," that all prosecutions either must be conducted by the D.C. Attorney General's office or U.S. Attorney's Office for D.C.); D.C. Code tit. 22 (laying out "Criminal Offense and Penalties" in D.C., but not including violations of attorney professional conduct rules adopted by the DCCA pursuant to § 11-2501); D.C. Code § 16-702 (providing that all criminal offenses must be prosecuted by either indictment or information).  While it may be possible to imagine a state bar disciplinary proceeding designed such that it is simply a criminal prosecution by another name—for example, one designed to punish attorneys, perhaps through imposition of a monetary penalty, beyond the protective and deterrent purposes of the Board's proceeding—no such proceeding is at issue here.

3.  Section 530B and the Functional Test

Mr. Clark argues that the court should find that, regardless of how it is labeled, "[i]f a state investigative body operates in an adjudicatory manner, and if a federal officer or his agent is subject to its process, the statutory requirements of § 1442(a)(1) are satisfied."  Opp'n to 1d Mot. Remand at 7.  For support, Mr. Clark relies principally on *Kolibash v. Comm. on Legal Ethics of W. Va. Bar*, 872 F.2d 571 (4th Cir. 1989), which endorsed a "functional test" to determining the nature of a proceeding for purposes of section 1442.  *Wilson v. Gottlieb*, 821 F. Supp.2d 778, 783 (D. Md. 2011) (characterizing *Kolibash*); *see* Opp'n to 1d Mot. Remand at 6–7.  The *Kolibash* court found that, although a state bar disciplinary proceeding was a "quasi-civil proceeding," because it was "adjudicatory in nature," to hold it "outside the operation of the removal statute would be to elevate form over substance."  *Kolibash*, 872 F.2d at 576.

At the outset it is important to note that the functional test is heavily contested in the context of removal under both sections 1441 and 1442.  *See Or. Bureau of Lab. and Indust. ex rel. Richardson v. West Comms.*, 288 F.3d 414, 418–19 (9th Cir. 2002) (rejecting the functional test because it "goes beyond the language of the statute" and is a "judicially-developed analysis that neither appears in, nor is necessarily implied by, the statutory language" and "changes the meaning and the reach of the statute."); *Porter Trust v. Rural Water Sewer and Solid Waste Mgmt. Dist. No. 1*, 607 F.3d 1251, 1255 (10th Cir. 2010) ("[T]he appropriate test involves application of the plain language of § 1441(a) rather than a functional test . . ."); *Sun Buick v. Saab Cars USA, Inc.*, 26 F.3d 1259, 1261–64 (3d Cir. 1994) (casting doubt on the functional test in context of removal under section 1441); *Wirtz Corp. v. United Distillers & Vintners N. Am., Inc.*, 224 F.3d 708, 713 (7th Cir. 2000) (declining to extend previous application of the functional test beyond "the particular facts of that case"); *N.Y. Div. of Human Rts. on Complaint*

20

*of Housing Opportunities Made Equal, Inc. v. Folino*, No. 11-cv-569A, 2011 WL 11068867, at

*2 (W.D.N.Y. July 11, 2011) (aligning with the "more recent trend away from functional

analysis and toward the plain language of the removal statute."); *Wade v. Burns*, 361 F. Supp. 3d

306, 311 (D. Conn. 2019) (rejecting the functional test in context of removal under section

1442); *In re Gorence*, 810 F. Supp. 1234, 1238 (D.N.M. 1992) (rejecting *Kolibash* as nonbinding

authority and finding that state bar disciplinary proceeding was not removeable under section

1442).[3]

It is also somewhat out of date.  The only case Mr. Clark cites that cuts against the "more

recent trend away from functional analysis and toward the plain language of the removal statute"

is *In re Lusk*, SACV 16-0930 AG, 2016 WL 4107671, at *5 (C.D. Cal. July 30, 2016).  *Folino*,

2011 WL 11068867, at *2; *see* Opp'n to 1d Mot. Remand at 7 n.2.  In that case, the court applied

*Kolibash* to uphold removal pursuant to section 1442 of a complaint by a private individual

against a National Guardsman for unlicensed practice of law in California.  *See In re Lusk*, 2016

WL 4107671, at *1–2.  In doing so, however, the court explained that the relevant state

procedure gave the state court "the potential power to seize [the respondent's] . . . military law

practice."  *Id.* at *5.  Accordingly, the court stressed that to grant remand would be to risk the

"extraordinary result" of "a state court seizing a military law practice regulated by the United

---

[3] The D.C. Circuit has not considered the merits of *Kolibash*.  Nor has it weighed in on
the broader issue beyond noting, in the context of evaluating the civil contempt proceeding that
could follow issuance of subpoenas in a state contract and tort action, that "[t]he circuits that
have considered whether proceedings not generally thought paradigm 'civil actions' or 'criminal
prosecutions' can be removed under § 1442(a) have not been uniform in their approach."  *Brown
& Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 414 (D.C. Cir. 1995).  The Circuit found
no occasion to resolve the ambiguity left by that lack of uniformity, as it found that the "circuits
to have confronted the question whether a contempt proceeding is removable have . . . answered
affirmatively."  *Id.*  In addition, as explored in depth below, decisions like this one that were
decided before the enactment of section 530B have limited relevance to the present analysis.

States Army." *Id.*  No similar risk is present here.  *See* D.C. Code § 11-2502 (permitting only censure, suspension or disbarment).  Indeed, a more closely analogous case decided closer in time to *Kolibash*, which the Court discusses further below, found that a state bar disciplinary proceeding was not removeable under the functional test.  *See In re Doe*, 801 F. Supp. 478, 482–83 (D.N.M. 1992) (distinguishing *Kolibash* and finding that state bar disciplinary proceeding was "neither civil nor criminal in nature" and therefore not removeable under section 1442).[4]

More centrally, *Kolibash* was decided long before section 530B was enacted, and the *In re Lusk* court did not consider—nor have the parties identified any court that has considered—how section 530B interacts with removal under section 1442.  Addressing itself to that task now, the Court finds that any argument that the Board's disciplinary proceeding should fit within a functional definition of "criminal prosecution" for purposes of removal under section 1442 is foreclosed by reference to section 530B.

Recall that, as discussed in detail *supra* Section II.A, Congress passed legislation amending the D.C. Code to authorize the DCCA to "make such rules as it deems proper respecting the examination, qualification, and admission of persons to membership in its bar, and their censure, suspension, and expulsion."  District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, § 101, 84 Stat. 473, 475 (1970).  Unlike in the sections of that legislation concerning "civil action[s]" and "criminal case[s]," 84 Stat. at 478–480, the chapter authorizing the DCCA to regulate admission to and empowering it to discipline members of its bar contained no provision for removal to federal court, *see* 84 Stat. at 520–21.

---

[4] *In re Doe* and a related case from this District, *United States v. Ferrara*, 847 F. Supp. 964 (D.D.C. 1993), involved consideration of the predecessor statutes to section 530B—which required that DOJ attorneys maintain state bar licensure, as discussed *supra* Section II.B—in relation to a New Mexico bar disciplinary proceeding.  These cases, the closest analogies to the present case of which the Court is aware, are discussed in detail below.

Acting pursuant to that chapter, the DCCA, and through it the Board, have adopted a comprehensive set of procedural and substantive rules governing discipline for admitted attorneys.  *See* D.C. Bar R. XI; Board Rules (Bd. on Prof. Resp. 2023).  Those rules provide for the DCCA-appointed Board to investigate "any alleged ground for discipline" and make findings and recommend sanctions to the DCCA, which holds final authority over disciplinary decisions. D.C. Bar R. XI, §§ 4, 9; *see In re Artis*, 883 A.2d at 92 ("[T]he ultimate choice of sanction is for the court to decide.").  Congress then passed section 530B making "attorney[s] for the Government . . . subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties."  28 U.S.C. § 530B(a).  It would utterly frustrate this scheme to construe the terms "civil action" and "criminal prosecution" in section 1442 to encompass the Board's disciplinary proceedings, and thereby permit near wholesale removal of such proceedings against federal government attorneys to federal court.[5]

Mr. Clark makes two unpersuasive arguments to the contrary.  First, he argues at length that D.C. is not a "state" within the meaning of section 530B because the statute does not specifically reference D.C. in subjecting government attorneys to "State laws and rules, and local Federal court rules."  *See* 1d Notice of Removal at 29–30; Opp'n to 1d Mot. Remand at 13; 2d Notice of Removal at 23–25; Opp'n to 2d Mot. Remand at 3–6.  The Court questions whether the DCCA, being on the one hand an Article I court and on the other specifically constructed to be "comparable to [courts] of the states," could plausibly be found to be neither a federal nor a state court.  *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1123 (D.C. Cir. 2004) (internal

---

[5] And surely it would be near wholesale, given that professional misconduct, by nature, is likely to be carried out "under color of" official authority.  28 U.S.C. § 1442(a)(1).

quotation omitted)).[6]  Regardless, section 530B *does* apply to D.C. by its own terms.  Section 530B(c) defines "attorney for the Government" to include "any attorney described in section 77.2(a) of part 77 of title 28 of the Code of Federal Regulations."  § 530B(c).  That regulation defines "attorney for the government" broadly to include attorneys who practice, by nature of their positions, in D.C.  *See* 28 C.F.R. § 77.2(a).  For example, it defines the term to include the Attorney General, Deputy Attorney General, Solicitor General and, "the Assistant Attorneys General"—the same position held by Mr. Clark.  *Id.*  It also includes "any attorney employed in, or head of, any other legal office in the Department of Justice agency," "any United States Attorney," and "any Assistant United States attorney," among others.  *Id.*  To accept Mr. Clark's position would be to subscribe to the absurd proposition that Congress chose to make these officials subject to jurisdictional rules of professional conduct everywhere except where they work.  *See United States v. Wilson*, 290 F.3d 347, 361 (D.C. Cir. 2002) (explaining that "'absurd results' are strongly disfavored" in statutory interpretation (quoting *Griffin v. Oceanic Contractors*, 458 U.S. 564, 575 (1982)).  That D.C. is home to, by far, the most government lawyers in the country only compounds this absurdity.  *See FedScope Federal Workforce Data*,

---

[6] The Court also notes that, applying Mr. Clark's literalist approach more broadly would threaten the availability of removal under section 1442 without reference to section 530B. Section 1442 permits removal civil actions or criminal prosecutions "commenced in a State court," a term it defines to include only, as relevant here, "the Superior Court of the District of Columbia."  28 U.S.C. § 1442(a), (d)(6).  But the disciplinary proceeding against Mr. Clark was commenced in the DCCA, not the Superior Court.  *See* Petition and Specification.  As it was Congress that vested the DCCA with authority to administer attorney discipline in D.C., *see* D.C. Code § 11-2502, that Congress also defined "State court" to include only the D.C. Superior Court is further evidence that it did not intend to make the Board's disciplinary proceeding removeable under section 1442.

U.S. Office of Personnel Management (Dec. 2022), https://www.fedscope.opm.gov (showing

D.C. with 14,810 government attorneys, compared to the next highest Virginia with 3,115).[7]

        The legislative history confirms beyond a whisper of doubt that Congress did not intend

to exempt D.C. from section 530B.  First, debate over section 530B took place during the

investigations of independent counsel Kenneth W. Starr.  Indeed, Mr. Starr issued his report

concluding that President Clinton committed perjury and attempted to obstruct justice on

September 11, 1998, just weeks before Congress passed section 530B as part of the omnibus

appropriations bill.  *See* Communication from Kenneth W. Starr, Independent Counsel, H.R.

Doc. No. 105-310 (1998).  This context, including broad upset among President Clinton's

supporters over a perception of prosecutorial overreach, affected Congress's consideration of

section 530B.  Most significantly, during floor debate, Representative John Conyers offered an

amendment to add "independent counsel[s] appointed under title 28 of the United States Code

and any employee of such independent counsel" to the definition of "attorney[s] for the

government" who would be subject to section 530B.  144 Cong. Rec. H7229 (daily ed. Aug. 5,

1998) (perfecting amendment offered by Rep. John Conyers).  Propounding the amendment from

the floor, Representative Conyers argued that "the present independent counsel, perhaps more

than anyone else, should be subject to each and every stringent provision that is included in this

measure."  *Id.* (statement of Rep. John Conyers).  This sentiment was echoed by others, *see, e.g.*,

*id.* at H7236 (statement of Rep. Terrance John Cox) ("I am talking about generic prosecutors, but

I am talking about Ken Starr also. . . .  We would not be in this debate today, would not have this

---

[7] To access the correct data set, click the link to "Employment" under heading "Status Data" on homepage; then click the link for March 2022; then click "Occupation – All" in the top ribbon; then select "White Collar," then "09xx-Legal and Kindred," then "0905-General Attorney;" and then click "United States" to see a state-by-state breakdown.

amendment today if this poster boy for unethical prosecutors had not violated all of us in the way

he has done."), and the amendment passed by a vote of 249 to 182, *id.* at H7242.[8]  The language

from the Conyers amendment remains in force in section 530B.  *See* 28 U.S.C. § 530B(c).

Of course, Mr. Starr's investigation was based in Washington, D.C., so the purpose of the

Conyers amendment could only have been to subject him to D.C.'s bar rules.  Similarly, in a

floor speech accompanying the introduction of his standalone version of the legislation that

would become section 530B, Representative McDade listed "specific instances of prosecutorial

misconduct" that would be remediated by the bill.  144 Cong. Rec. E301 (daily ed. Mar. 5, 1998)

(statement of Rep. Joseph M. McDade).  Included in that list were multiple cases prosecuted in

D.C., which, again, only makes sense if the intent of the legislation was to subject government

attorneys in D.C. to D.C.'s bar rules.  *See id.* at E302–03 (citing *Barry v. United States*, 865 F.2d

1317 (D.C. Cir. 1989), *United States v. Cuffie*, 80 F.3d 514 (D.C. Cir. 1996), *United States v.*

*Heldt*, 668 F.2d 1238 (D.C. Cir. 1981), and *United States v. Adonis*, 744 F. Supp. 336, 345–47

(D.D.C. 1990)).  Accordingly, both the text and legislative history of section 530B make

unmistakably clear that it applies to D.C.[9]

---

[8] Congress considered, and rejected, legislation to amend section 530B after it took effect
in 1999.  *See* Federal Prosecutor Ethics Act, S. 250, 106th Cong. (1999).  The report of a hearing
by the Subcommittee on Criminal Justice Oversight in which the bill was considered further
confirms that Congress understood section 530B as at least in part a reaction to the Starr
investigations.  *See, e.g.*, *The Effect of State Ethics Rules on Federal Law Enforcement: Hearing*
*Before the Subcomm. on Criminal Justice Oversight*, 106th Cong. 4 (1999) (statement of Sen.
Chuck Schumer) ("I also believe the adoption of [section 530B] last year had something to do
with the fact that 1998 presented us with a high-profile example of overreaching on the part of
one prosecutor.  In this sense, Federal prosecutors as a whole were punished for the sins of Ken
Starr.").

[9] ODC also makes an alternative argument that, even if section 530B is ambiguous in its
application to D.C., the Court should apply deference, under *Chevron U.S.A. v. Nat. Res. Def.*
*Council*, 467 U.S. 837 (1984), to DOJ's reasonable interpretation, made explicit in its regulations
pursuant to section 530B(b), that the statute does apply to D.C.  *See* 28 C.F.R. § 77.2(i) (defining
"state of licensure" to include "the District of Columbia"); 1d Mot. Remand at 4.  Mr. Clark

Second, Mr. Clark cites authority for the general proposition that section 1442 should be construed broadly.  He principally relies on the Supreme Court's opinions in *Willingham v. Morgan*, 395 U.S. 402 (1969) and *Mesa v. California*, 489 U.S. 121 (1989).  *See* Opp'n to 1d Mot. Remand at 14–15; Opp'n to 2d Mot. Remand at 17.  *Willingham* involved a suit against the warden and chief medical officer at a U.S. prison.  *See Willingham*, 395 U.S. at 403.  The Court reviewed the long history of section 1442 and its purpose to "protect federal officers from interference by hostile state courts."  *Id.* at 405.  In light of that purpose, the Court explained that section 1442 "is not 'narrow' or 'limited'" but "is broad enough to cover *all cases* where federal officers can raise a colorable defense arising out of their duty to enforce federal law."  *Id.* at 407 (emphasis added).  *Mesa* reiterated this explanation in the context of a suit against U.S. Postal Service employees for traffic violations, although, notably, in the process of affirming the remand order of the court below.  *See Mesa*, 489 U.S. at 123.

Mr. Clark seizes on the words "all cases" as used in *Willingham* and quoted in *Mesa* as if they rewrite the statutory language "civil action" and "criminal prosecution" rather than simply paraphrasing it.  *See, e.g.*, Opp'n to 1d Mot. Remand at 2–3.  But the question before the *Willingham* court was how broadly to read section 1442's requirement that the federal officer's actions be done "under color" of his office.  *See Willingham*, 395 U.S. at 407.  And the related question before the *Mesa* court was whether removal under section 1442 also requires the federal officer to raise a federal defense.  *See Mesa*, 489 U.S. at 139.  Neither case examined the scope of the terms "civil action" or "criminal prosecution," neither involved a state bar disciplinary proceeding, and both were decided long before the enactment of section 530B.  The teaching of

---

disagrees.  *See* 1d Notice of Removal at 31.  Because the Court finds that section 530B unambiguously applies to D.C., it does not reach this alternative argument.

these cases, therefore, is that courts should construe broadly what *conduct* provides a proper basis for removal of a proceeding under section 1442; they say nothing about how courts should construe the nature of the *proceeding* itself—especially in the presence of a separate statute committing the subject matter of a proceeding to state control.

Moreover, the concern animating the principle of broad construction is not present here. The *Willingham* Court explained that the availability of removal under section 1442 reflects the concern that, in certain cases, "federal officers, and indeed the Federal Government itself, require the protection of a federal forum." *Willingham*, 395 U.S. at 407. The *Mesa* Court similarly recognized section 1442's purpose to protect against "true state hostility." *Mesa*, 489 U.S. at 139. Both cases cited *Tennessee v. Davis*, 100 U.S. 257 (1880) for support. *See id.; Willingham*, 395 U.S. at 406. *Davis* involved the state murder prosecution of a federal revenue officer who returned fire when attacked in the performance of his "duty to seize illicit distilleries and the apparatus used for the illicit and unlawful distillation of spirits." *Davis*, 100 U.S. at 257. The Court found removal of such criminal proceedings appropriate, explaining that "[t]he legislation of a State may be unfriendly" and "affix penalties to acts done under the immediate direction of the national government, and in obedience to its laws," or "deny the authority conferred by those laws." *Id.* at 263. Indeed, intense state opposition to federal revenue laws motivated passage of an early iteration of the federal officer removal statute, *see* David N. Goldman, *The Neglected History of State Prosecutions for State Crimes in Federal Courts*, 52 Tex. Tech. L. Rev. 783, 788–89 (2020) [hereinafter *Neglected History*] (explaining the history of the Force Act of 1833), an amended version of which was in force when *Davis* was decided, *see Davis*, 100 U.S. at 261.

*Davis* was itself an echo of earlier cases involving sharp disagreements between the state and federal governments. In fact, the first known case of federal officer removal involved a

federal officer, acting under orders to enforce a treaty protecting tribal territory in Alabama from incursion by settlers in the early 1830s, who was prosecuted by Alabama after he shot a settler who resisted his attempts to remove him from the territory.  *See* Goldman, *Neglected History*, *supra*, at 813–14.  With "the Alabama government and its citizens on one side and the federal government on the other," President Andrew Jackson ordered the case removed to federal court. *Id.* at 813–15.[10]  Similarly, in response to northern states' efforts to legislatively nullify the Fugitive Slave Act, in 1855 the Senate engaged in "epic" debate over a bill to amend the federal officer removal statute to permit removal of cases against officers for enforcing the Act.  *Id.* at 795–96.

The point is that, to whatever extent Mr. Clark's appeal to precedent counsels in favor of a broad construction of section 1442, it equally reveals the roots of this principle in conflict between state and federal interests.  *See, e.g.*, *Davis,* 100 U.S. at 263 (warning of the peril of providing no federal forum for federal officers charged with "an alleged offense against the law of the state, yet warranted by the federal authority they possess").  It is because of such conflict that federal officers require the "protection of a federal forum," *Willingham*, 395 U.S. at 407, lest they be subject to "true state hostility," *Mesa*, 489 U.S. at 139.  *See In re Gorence*, 810 F. Supp. at 1238 ("Without conflict [between state and federal interests], no purpose exists for removing the action concerning the federal officer to federal court.").  In stark contrast to the divergent state and federal approaches to tribal land use, revenue collection, and slaveholding that motivated early attempts to craft federal officer removal policy, here, through section 530B,

---

[10] While Congress had recently passed the first version of the federal officer removal statute, as noted in reference to *Davis* above, it only covered removal of cases against federal officers "for or on account of any act done under the revenue laws of the United States." Goldman, *Neglected History*, *supra*, at 788 (quoting the Force Act of 1833).

Congress has explicitly directed that federal officers be subject to state bar rules.  With federal and state interests thus aligned, nothing in the cases cited by Mr. Clark, or in the history of the federal officer removal statute, supports resolving any remainder of ambiguity concerning the removability of a state bar disciplinary proceeding in favor of granting a federal forum.  Indeed, well-established principles of comity for state proceedings counsel against it.  *See Garden State*, 457 U.S. at 431 (applying the abstention principle first outlined in *Younger v. Harris*, 401 U.S. 37 (1971) to a constitutional attack on state bar disciplinary rules during the pendency of a disciplinary proceeding, explaining that such proceeding "are of a character to warrant federal-court deference"); *Klayman v. Lim*, 830 Fed. Appx. 660, 662 (D.C. Cir. 2020) (affirming district court's abstention from deciding claims for injunctive relief "against ongoing proceedings within the District of Columbia's system of attorney discipline").

This reasoning is reinforced by the related opinions of the only courts that appear to have directly considered a similar question.  In *In re Doe*, 801 F. Supp. 478 (D.N.M. 1992), the court considered the removal of a New Mexico state bar disciplinary proceeding against an Assistant U.S. Attorney ("AUSA") for violation of the no-contact rule.  The prosecution at issue occurred in D.C., so the Board first considered the alleged misconduct, but referred the matter to the New Mexico Disciplinary Board (the "NM Board") upon finding that the AUSA was licensed only in New Mexico.  *See In re Doe*, 801 F. Supp. at 480–81.  The AUSA removed the proceeding to federal district court in New Mexico under section 1442.  *See id.* at 481.  Considering the NM Board's motion to remand, the court found that the "disciplinary proceeding [was] neither a criminal prosecution nor a civil action against [the AUSA]" and that the AUSA had no colorable federal defense, so it granted the motion.  *Id.* at 482–89.

Thereafter, back in D.C., the United States initiated an action to enjoin the NM Board's

proceeding, giving rise to the court's opinion in *United States v. Ferrara*, 847 F. Supp. 964

(D.D.C. 1993).  The issue before the court on the parties' cross motions for summary judgment

was "whether the Supremacy Clause would be violated by allowing the disciplinary proceeding

in New Mexico to go forward."  *Ferrara*, 847 F. Supp. at 967.  The court first held that it lacked

personal jurisdiction over the NM Board, but nonetheless found, after thorough analysis, that the

"Supremacy Clause is no impediment to the maintenance of a disciplinary proceeding against

[the AUSA] by the Disciplinary Board of New Mexico."  *Id.* at 968.  Importantly, the court

explained that the predecessor statutes to section 530B, which required that DOJ attorneys "be

duly licensed and authorized to practice as an attorney under the laws of a State, territory, or the

District of Columbia," Department of Justice Appropriation Authorization Act, Pub. L. No. 96-

132, § 3(a), 93 Stat. 1040, 1044 (1979),[11] established that Congress "clearly contemplated

compliance with [the state of licensure's] code of professional responsibility," *Ferrara*, 847 F.

Supp. at 969.  Accordingly, it reasoned that, "[b]ecause state regulation of the federal function is

here authorized by Congress, this Court will not interfere with that regulation."  *Id.*; *see also In*

*re Howes*, 123 N.M. 311, 320–21 (N.M. 1997) (adopting *In re Doe*, 801 F. Supp 478 and

*Ferrara*, 847 F. Supp. 964); *United States v. Tapp*, No. CR107-108, 2008 WL 2371422, at *9

(S.D. Ga. June 4, 2008) (describing the section 530B predecessor statute as a "major change for

Justice Department lawyers" in which "Congress mandated that they be admitted to practice and

licensed by the state courts, thereby placing them under the supervisions of *these courts*

concerning their professional conduct" (emphasis added)).

---

[11] *See supra* Section II.B.

Section 530B crystalizes the *Ferrera* court's inference in statute: Congress has

committed the regulation of federal government attorneys to the states and courts where they

practice.  *See N.Y. Bar Ass'n*, 276 F. Supp. 2d at 133 (explaining that section 530B "reflects the

respect Congress has for the right of the states to regulate the ethical conduct of lawyers who

practice law in their jurisdictions.").[12]  Consistent with that directive, and with the tradition,

"[s]ince the founding of the Republic," that attorney regulation be left "exclusively to the States

and the District of Columbia within their respective jurisdictions," *Leis*, 439 U.S. at 442,[13] the

Court finds that Mr. Clark has not met his burden to establish federal jurisdiction over the

Board's disciplinary proceeding under section 1442.[14]

### B.  Federal Question Jurisdiction

Notwithstanding its finding that the Board's disciplinary proceeding is neither a "civil

action" nor a "criminal prosecution" within the meaning of the removal statutes, the Court

briefly addresses Mr. Clark's inconsistent alternative arguments that federal question jurisdiction

---

[12] As noted above, it may be possible to imagine a state bar disciplinary proceeding designed such that it is simply a "criminal prosecution" by another name, but for the reasons explained *supra* Sections IV.A.1–2, the Board's proceeding against Mr. Clark is not within that category.

[13] This tradition remains firmly established even where the state proceeding concerns a high-ranking federal government official.  *See, e.g.*, *Neal v. Clinton*, No. 2000-5677, 2001 WL 34355768, at *3 (Ark. Cir. Ct. Jan. 19, 2001) (ordering 5-year suspension of President Clinton's law license and a fine based on conduct in office); *In re Nixon*, 53 A.D.2d 178, 182 (N.Y. App. Div. 1976) (ordering disbarment of President Nixon for conduct in office); *Md. State Bar Ass'n v. Agnew*, 271 Md. 543, 544–45, 552–54 (Md. 1974) (ordering disbarment of Vice President Spiro Agnew); *In re Swindall*, 266 Ga. 553, 554 (Ga. 1996) (ordering disbarment of Congressman Patrick Swindall); *State Bar of Nev. v. Claiborne*, 104 Nev. 115, 231-32 (Nev. 1988) (considering at length but ultimately declining to impose discipline on U.S. District Judge Harry Claiborne).

[14] As the Court finds that the Board's disciplinary action is not a removeable proceeding under section 1442, it does not reach the questions of whether Mr. Clark acted "under color" of his office or has pled a colorable federal defense.

lies under 28 U.S.C. § 1331.  First, rehashing the argument that section 530B does not apply to D.C., Mr. Clark's first and second notices of removal argue that section 530B constitutes a congressional decree that federal government attorneys in D.C. not be subject to regulation except by the federal government.  *See* 1d Notice of Removal at 30.  Accordingly, he contends, "the DCCA is entirely fenced out of the federal grant of authority to regulate Justice Department lawyers engaged in internal deliberations" and "that area of regulation is, in short, completely preempted."  *Id.*  Next, he amends this argument in his opposition to ODC's first motion to remand, claiming instead that complete preemption applies because "[t]he regulation of lawyers employed by the U.S. Justice Department was not historically within the States' sphere of power."  Opp'n to 1d Mot. Remand at 20.  Finally, in opposition to ODC's second motion to remand, he reverts to his first argument, but with the twist that, even if section 530B applies to D.C., the fact that it subjects federal government attorneys to state bar rules only "to the same extent and in the same manner as other attorneys" somehow renders the Board's proceeding preempted.  Opp'n to 2d Mot. Remand at 11–12.

There is no merit to these arguments.  As to the first, the Court has found that section 530B applies to D.C.  *See infra* Section IV.A.3.  As to the second, Mr. Clark, only citing two out-of-date and largely irrelevant OLC opinions for support, misstates the history of state regulation of attorneys.  *See Leis*, 439 U.S. at 442 ("Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions.").  As to the third, the Court struggles to see anything in a statute that explicitly subjects federal government attorneys to regulation by states that preempts their regulation by states.  This case does not arise under federal law.

### C.  Ancillary Removal

To the extent Mr. Clark argues that ODC's motion to enforce the October 6 subpoena should be separately removeable, *see* 2d Notice of Removal at 1–2; Opp'n to 1d Mot. Remand at 18–19, the Court cannot agree.  "Proceedings that are ancillary to an action pending in state court cannot be removed separately from the main claim."  Wright & Miller, *supra*, at § 3721.1. Courts have found this doctrine, historically developed with respect to the general removal statute, "applicable in the § 1442 context."  *Ohio v. Doe*, 433 F.3d 502, 506 (6th Cir. 2006); *see also Armistead v. C&M Transport*, 49 F.3d 43, 45–46 (1st Cir. 1995); *Wuxi Taihu Tractor Co. v. York Grp.*, 460 Fed. Appx. 357, 358–59 (5th Cir. 2012).  "This prudential doctrine seeks to avoid the waste of having federal courts entertain satellite elements of pending state suits and judgments."  *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 724 (7th Cir.) (finding that federal action for a declaratory judgment alongside a parallel state court proceeding was removeable as an "independent controversy with some new and different party" (citation omitted)).

Mr. Clark argues that removal of the subpoena enforcement action alone is contemplated by the text of section 1442, which defines "civil action" and "criminal prosecution" to include "any proceeding (whether or not ancillary to another proceeding) to the extent that in such a proceeding a judicial order, including a subpoena for testimony or documents, is sought or raised."  28 U.S.C. § 1442(d)(1); *see Brown & Williamson*, 62 F.3d at 412–415 (finding subpoena issued to non-party congressmen in the context of a state contract and tort suit removeable as a "civil action").  But that provision, added to section 1442 as part of the Removal Clarification Act of 2011, merely "respond[ed] to" what was at the time an "inter- and intra-circuit split as to whether State 'pre-suit discovery' laws qualify as civil actions or criminal prosecutions that are removeable under § 1442."  H.R. Rep. No. 112-17, at 2 (2011).  The

Committee report explains that this "problem occurs when a plaintiff who contemplates suit against a Federal officer petitions for discovery without actually filing suit in State court." *Id.* at 4. In light of the narrow purpose of this legislation to close a loophole under which certain courts rejected removal of pre-suit civil discovery demands, the Court will not extend the reach of section 1442(d)(1) to cover this "satellite " enforcement action involving no new parties that is "an integral part of" and "supplementary to" the otherwise unremovable Board proceeding. *Armistead*, 49 F.3d at 46. To hold otherwise would render state bars toothless to enforce their disciplinary rules, in defiance of section 530B's purpose to subject federal government attorneys to those rules. This approach also is consistent with well-established principles of comity, under which federal courts abstain from interfering in "state criminal prosecutions" and "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Spring Comms., Inc. v. Jacobs*, 571 U.S. 69, 78 (2013) (citation omitted). The Supreme Court has explained that these principles apply in the similar context of state court contempt proceedings. *See Juidice v. Vail*, 430 U.S. 327, 335 (1977) ("Whether disobedience of a court-sanctioned subpoena, and the resulting process leading to a finding of contempt of court, is labeled civil, quasi-criminal, or criminal in nature, we think the salient fact is that federal court interference with the State's contempt process is 'an offense to the State's interest . . . likely to be every bit as great as it would be were this a criminal proceeding." (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 604 (1975)).

Accordingly, because ODC's motion to enforce the subpoena before the DCCA is a "supplementary proceeding" that is "incident to" and a "substantial continuation" of the Board's disciplinary proceeding, not an "original and independent proceeding," and in line with

principles of comity, the Court rejects Mr. Clark's attempt to remove it separate from the disciplinary proceeding to this Court.  *Barrow v. Hunton*, 99 U.S. 80, 82–83 (1878).

## V.  CONCLUSION

For the foregoing reasons, ODC's Motions to Remand (Case No. 22-mc-0096, ECF No. 5; Case No. 22-mc-0117, ECF No. 4; Case No. 23-mc-0007, ECF No. 4) are **GRANTED**.  In addition, because the Court lacks subject-matter jurisdiction over this matter, Mr. Clark's Motion to Stay Subpoena Response Deadline (Case No. 22-mc-0096, ECF No. 2) and Motion to Quash (Case No. 22-mc-0096, ECF No. 4) are **DENIED** as moot.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  June 8, 2023                                                    RUDOLPH CONTRERAS
                                                                              United States District Judge

36